Good afternoon everyone. We have two cases on the agenda for this afternoon and the first is Sikkelee v. Precision Airmotive Corporation, appellate number 17-3006. We'll hear from the appellant. May it please the court, there are broadly speaking two issues here, a state law issue and a federal preemption issue. I'd like to start with the state law question and go directly to what I think is the other side's most important argument. Throughout their brief, they say again and again that they were not in the chain of distribution for the carburetor that replaced the original carburetor on their engine and therefore cannot be held liable for it. And this argument has some force as the policy and law of strict liability has evolved. However, what's important I'm curious as to why you're starting with the state law issue. Don't you really think the preemption issue is the key to this case? Well, Your Honor, you should only really reach the preemption issue after you rule in our favor on state law grounds. If there is a state law basis on which we lose, then you don't get the preemption ordinarily because it would be deciding a constitutional question unnecessarily. We think that's something the district court did wrong in this case, but if Your Honor likes, I'm happy to talk about preemption first. The only point I would make on state law, just to wrap it up, is that their argument, which I think is their strongest state argument, really only applies to one of our theories of liability, the theory that they are directly responsible for flaws in the replacement carburetor itself as the designer of that carburetor. We have a primary theory of liability, which is that they are liable for defects in the engine that left their possession, that they conceivably manufactured and sold in 1969, and which reached the plaintiffs without any substantial unforeseeable change in its conditions. Counsel, you know, you're arguing like a debater. You're trying to get as many words in as quickly as you can. I'll slow down, Your Honor. If you slow down, I'd appreciate it. Absolutely. Absolutely. So you're saying that it was because the engine overall is what left their custody at some point? That's correct, Your Honor. So it's your position that Pennsylvania does not provide a means for holding them liable for component parts that their design was used to make? Oh, no. Our position is emphatically that it does. What is your authority for that position? So we think the best – what is clear in this case is that the overhaul of the carburetor was accomplished pursuant to instructions issued by Lycoming, their engine overhaul manual, which instructed the overhaulers to follow their service bulletins. I understand the factual background. My question is – I'm sorry if it wasn't clear. It was the legal authority. Oh, sure. Or saying that a manufacturer is responsible for component parts put together by someone else. Yeah. So the best case for this is Pridgen v. Parker Hennepin Corporation. That was also a case where Lycoming argued that an overhauled carburetor had been assembled by a third party, and Pennsylvania courts found Lycoming liable for defects in that carburetor. The facts are somewhat different. Lycoming participated in the overhaul in that case. However, the actual assembly of the carburetor itself, the defective component, was done by a third party, just as it was in this case. And we think that that case is strong authority for the proposition that when, as here, the design is identical to the original product design, the instructions are given by the original manufacturer and followed by the overhauler in assembling the new product, that strict liability should attach then to – And even with a negligence cause of action, questions that – I mean, I'm surprised you're not arguing that a jury might be the entity that's supposed to consider these. Oh, absolutely. We are arguing that, Your Honor. That is the point that I was just about to make when Judge Roth reminded me I'm trying to get to it too fast. So all of these questions under Pennsylvania law are emphatically the province of the jury. The Supreme Court's decision in Tincture v. Omega Flex clarified that whether the product is defective in the first instance is a jury question. And it has long been the case that the question of whether the product underwent a substantial change, whether that change was foreseeable, and whether there was causation are all jury questions except in the most unusual circumstances. Here, there is not a lot of evidence that Lycoming could point to that would refute the evidence that we presented. At most, they have a jury question on some of these issues and should not have received some – And this is an alternative ground of the district court in any event, correct? Which one? The issue of Pennsylvania law. Yes, aside from conflict preemption. And unless the court has other questions about state law, I'm happy to turn to preemption now. Why don't we turn to state law? So on the issue of conflict preemption, one thing we think is clear and very important. The district court's decision is the first decision to ever find conflict preemption of a general aviation products liability claim. And it adopted the most sweeping rule you could have in a design defect case. If affirmed, the district court's decision will extinguish all design defect claims in the general aviation space. And we think that simply cannot be the law. There have been claims like this brought for more than 70 years now. Congress legislated specifically in this area in 1994 with the General Aviation Revitalization Act. So what's the conflict preemption test? So the question is whether Lycoming can show that it is impossible for it to comply with both state and federal law. It's the Wyeth test. That's right, Your Honor. So we have said that there are several things Lycoming should have done differently. It should have designed this engine differently in the first instance. It should have changed the design subsequent to that. It should have issued appropriate warnings. It should have given information to the Federal Aviation Administration. I think where Judge Randall is focusing, and I'd like to go into this too, is about Wyeth and whether or not Lycoming is really like Wyeth. Yeah. And Wyeth, as you know, there was the regulatory scheme that allowed the pharmaceutical manufacturer to make certain changes to the label concurrent with its application for permission to make the change. Yeah. How is Lycoming like that? So with respect to certain of our theories of liability, there are no federal constraints whatsoever on Lycoming's ability to act. For example, its ability to give more information to the FAA. There's no federal law that stops them from doing that. Or updating warnings in certain manners. They can do that without any FAA involvement too. The big question revolves around whether they can change their design without first going to the FAA. Well, and when you say design, we're talking about minor changes versus major changes, aren't we? Maybe. So that is certainly one important aspect of this. Here's how we think this works. Well, if it is a major change, they can't do anything without FAA approval, correct? That is probably correct. I have seen a report once that says Lycoming can implement major changes by consulting their designated engineering representative. There is no evidence in the record about what procedure Lycoming would follow. Are you urging that this is a minor change or not? Yes. Yes. Absolutely. A minor change, I gather, does not affect the airworthiness of the aircraft. So this precise wording of the regulation. Are you agreeing with me? The precise wording of the regulation, Judge Roth, is that it has no appreciable effect on certain characteristics. And that word appreciable has been interpreted in very specific ways. It's not just the common understanding that it wouldn't matter at all. Mostly the way that this is interpreted in practice is that there is no appreciable effect on airworthiness and there is no appreciable negative effect. But I thought your experts' theories in the position the plaintiff was taking is this connecting system, replacing the wires with the hex-shaped screws and locks, tab locks, I thought that change was so significant that that's why fuel was getting into the end. And so wouldn't that affect airworthiness? I guess what I go back to, are you saying this is a minor? Are you really taking the position it's a minor change? We are saying that if so, the decision to classify a change as minor or major rests in the first instance with the manufacturer. They're allowed to make that determination completely unilaterally. Applying the framework of wire. What is your position? So our position, Your Honor, is that they cannot claim impossibility because they could attempt to do this as a minor change and there is no clear evidence that the FAA would stop them from doing so. What if it was a major change? If it was a major change, then they might have to submit an application to the FAA first. Even in that case, we think that there should be no conflict preemption. And let me just explain why. The conflict preemption precedents that we've imported here from the drug labeling context, the cases that say you have to be able to act unilaterally, PLEVA and Bartlett, are cases where the generic drug manufacturer had no viable path to get a label change approved. But we know in this sector, in this industry, major changes happen all the time. They are easily accomplished. And so what I would say is if you think of these cases as being on a spectrum where PLEVA and Bartlett are over here, the manufacturer is the most constrained, Wyeth is here, the manufacturer has some ability to take temporary unilateral action while the FDA considers their application. The aviation cases are over here in the sense that the manufacturers have a huge amount of autonomy in this area. And is unilateral action even necessary? I mean, under Wyeth, unless you can show that the FAA would not have approved the change, there is no conflict preemption. And here, assuming you're talking about the difference between the wire and the washers, the FAA had previously provided for the wire. And when the washers were failing, they asked Lycoming, you know, what are you going to do about it? It's very likely they would have said, well, let's go back to the wire part. There was nothing wrong with it. We just decided to change it. I think that's completely correct. And I do think that when you consider the impossibility inquiry, we shouldn't blind ourselves to probability. Treating this strictly as a question of can they act completely unilaterally or not, we think this is the forest for the trees. Because even if they have to seek approval first, if the approval is virtually certain to be granted, as it is here, we don't think it makes sense to say a manufacturer can claim impossibility. Now, I would like to reserve time for rebuttal. I don't know if the court is going to do that. I asked for four minutes up front, but I know we've gone way past what everybody thought. We're good. You can have it. Okay. You can have rebuttal. No, you're not. Your red light isn't on yet. You're just on the caution. And I'm watching the time. You're good. You've got your four minutes. Okay. Fifteen seconds left. The only point I would add here is that even if you consider that they have to act unilaterally, we do think that they can attempt to do that through the minor change procedure. And just as in Wyeth, it should be their burden to show with clear evidence that the FAA would not let them do that. Okay. We'll see you on rebuttal. Good afternoon. Good afternoon, and thank you, Judge Schwartz, Canon Shanmugam of Williams & Connolly for the Appalachia Appco Corporation. May it please the Court, in this case, plaintiff reached a $2 million settlement with Kelly, which assembled the replacement carburetor. Why does that matter for our question as to the liability of Lycomie? It matters solely because Kelly and Lycomie stand in a fundamentally different position, particularly for purposes of state law. With regard to state law, there's really no question that Kelly, as the manufacturer of the replacement parts at issue, could be liable under Hornbook principles of strict law and negligence. But those principles, I respectfully submit, point in exactly the same direction with regard to an entity like Lycomie, an entity that at most could be said to be responsible in the sense that they weren't even the designer but the holder of the design approval for a competitor product. And that's why we agree with my friend, Mr. Singh, that you have to start with the state law question, not least out of principles of judicial modesty to avoid a potential federal constitutional question. And on the state law question, regardless of which of the theories of liability on which plaintiff is proceeding, state law plainly indicates that there is a limitation, and I would respectfully submit a legal limitation at the threshold, as to the class of defendants that can be held liable. With regard to the strict liability claim, the principle is the familiar principle that for purposes of a Section 402A claim, the only entities that can be held liable are entities that are either the manufacturer, the seller, or otherwise in the chain of distribution. That is a principle that the Pennsylvania Supreme Court reiterated in the Tincture case, really the most significant recent pronouncement from the Pennsylvania Supreme Court. And again, it's a familiar principle that is addressed in lower court decisional authority, both pre-Tincture and post-Tincture. What about negligence, though, where if the proposition is everyone who's doing anything in connection with the claim under a particular type certificate has to follow that design? And a manufacturer knows it needs all kinds of components, and it's not making all of them, but it knows all of the design plans that need to be followed. Why isn't it for negligence purposes foreseeable to an entity like Lycoming that the carburetor would have been made consistent with its own design? I believe that the principle is largely the same, but it's located in the element of duty for purposes of negligence, which is to say that the principle is what is often referred to as the obligation of product identification. That is to say that you have a duty of care only to the consumers of your own product, and you do not have a duty to the consumers of a competitor product. Now, this was really not the focus in great detail of Judge Brand's opinion or really of the briefing until plaintiff's reply brief. We did cite the Mellon case from the Pennsylvania Superior Court for that proposition, and there are certainly other cases that articulate that proposition as well. And, again, this is a very familiar principle of tort law. Your Honor may be aware of the fact that there is a considerable body of law on this issue with regard to pharmaceutical products because some effort has been made, ironically enough, in light of the Supreme Court's preemption jurisprudence to hold brand-name drug manufacturers liable for consumers of generic products. But what's your best case in this fact pattern? What's your best case for the proposition that you cite? So I think that the best case in the strict liability context is... I'm talking negligence. Negligence. I think it really is the Mellon case, and, again, there are other cases that stand for the same proposition, again, that you have a duty only to those who consume your own product. And I would respectfully submit Judge Randell that that is a... So Lycoming certainly would owe a duty. It is not the designer, but it is in the chain of distribution for those who use a product that ships with the original engine. But that is, I think, a far cry from holding them liable on this design-by-proxy theory. It may be a far cry, but it's not a slam dunk that they couldn't be. And they issued SB 366, which dictated the way this was going to be done. And the consumer, I mean, is the end consumer the person who is on the plane? So, I mean, there are a lot of issues here. You're asking us to... on authority of cases not exactly on all fours. So, Judge Randell, let me address both the sort of the state law piece of your question and the federal law piece of the question, because, of course, the state law question could arise in any number of different contexts. As we point out, there is no affirmative... And you're probably aware that we very often certify issues. Yes, and that is an exception to you. I mean, for us to be... Tincture is confusing enough, let alone if we were to dip our big toe into this pool of water and recat it for all the state court judges. It's not confusing on this issue, though. I think we can all take judicial notice of the fact that there are other aspects of that decision that might be. But I would respectfully submit that there is no need to certify, because as this court has stated, as a court sitting in diversity, it should not recognize expansive theories of tort liability absent some indication in state law that the state courts would permit it. And I would respectfully submit that when Judge Schwartz asked the obvious question of my friend Mr. Singh, what is your best case for the proposition that you can be held liable at state law for a component part, an aftermarket component part manufactured by a competitor, which again is an issue, Judge Rendell, that could arise in the context of cars, smart phones, or any other sort of product. The case he cited was the Pridgen case, a case that is plainly distinguishable, because to the extent that the Pennsylvania Supreme Court addressed state law at all, and the primary issue, the legal issue in the case, was a federal issue involving a statute of repose, it discussed Section 400 liability. That is a quite independent and conceitedly inapplicable basis for liability in this case, where you have an apparent manufacturer, and as Mr. Singh rightly and candidly acknowledged, in that case you had a much greater degree of involvement by Lycoming, such that it could be said to be the apparent manufacturer of the carburetor, and therefore that the buyer of the carburetor could be said to have acted in reliance on that. There was no discussion. The asbestos cases, there's cases that arise out of the history of Pennsylvania applying Pennsylvania state law, and at least for negligence purposes, they're saying to the manufacturer it was foreseeable that the replacement part was going to have the dangerous substance of asbestos. You, manufacturer, could be held responsible under a negligence theory. Why isn't this like that? Lycoming's operating under the type certificate. The FAA says if you hold the type certificate, you're responsible for the design. The design was used to make the carburetor. Why isn't this an analogy to that asbestos case, if you're familiar with it? I think it's been cited in the book. Yeah, I'm familiar with that, and I think actually the Schwartz case is actually in many ways, I think, the best case for us. I think we would respectfully disagree with one aspect of the discussion of the negligence claim, but, of course, the Schwartz case is primarily helpful for us in its discussion of the principle of what the product is and whether or not. Yeah, I'm really focused more on this kind of the foreseeability component and the part of Schwartz that helps your adversary. Yeah, and I think with respect, I think that to the extent that we disagree with the Schwartz decision, it's really primarily on this question of the definition of the duty. In that case, you know, is a case where the product was essentially surely going to be used with an asbestos-containing product? And to get back to Judge Rendell's question and to finish answering yours, Judge Schwartz, I think that in this context, this is sort of a critically different context for the simple reason that when you're dealing with aftermarket parts in this context, in the aviation context, the aftermarket parts manufacturer is subject to an entirely separate regulatory regime and stands in the same place as the original manufacturer, both like Homing and Kelly, are holders of independent design approvals. The aftermarket parts manufacturer, unlike companies in the pharmaceutical context, even in which the law is generally favorable for us, the manufacturer of the replacement part in this context is under no obligation of sameness, no obligation of identicality. If you look at the relevant regulation. But it still has to comply with the design certificate, the type certificate, and the design embodied in it, yes? Well, I don't think that that's quite right. It certainly, all it has to do under Section 14 CFR 21-303-A-4 is that the PMA applicant has to show that the component meets the airworthiness requirements of this subchapter. Now, it is certainly true that in this case, Kelly is the manufacturer of the part, manufactured the relevant parts in a way where they were similar in form, fit, and function, in the words of plaintiff's own expert. But are you saying then that Kelly can deviate from the type certificate, but like Homing can't? Is that your position? Well, the real question. If that's the case, why can't like Homing if Kelly could? So, Judge Schwartz, and this is going to lead to preemption, I certainly want to spend a little bit of time on preemption as well. Let me just actually say one last thing on state law and then address this with your leave so that we can talk entirely about preemption. I think on state law, the one thing that I would leave you with is that if you have any inclination to think that perhaps a negligence claim can move forward, even if the strict liability claim shouldn't, I think that's the point at which, Judge Rendell, I would respectfully submit you really ought to certify because it is a massive proposition. And again, plaintiff cannot point to a single case affirmatively permitting this, to say that for purposes of Pennsylvania law, the original manufacturer of a component part can be held liable at negligence to a consumer of an aftermarket replacement part manufactured by a competitor. And that has tremendous consequences, not just in the aviation context, but beyond. I think with regard to preemption, Judge Schwartz, I think that it is critically important, however you frame the preemption standard, to focus on the fact that the aftermarket part manufacturer does have the ability to quote, unquote, deviate from the type design in the sense that the part does not have to be identical. And so, for instance, if Kelly had so wished, Kelly could have come in itself and sought approval for the use of safety wire rather than lock tab washers. Should Lycoming? Lycoming. Would have done that too, right? I think what Lycoming would have to do is Lycoming would be governed by the obligations for type design holders. So if Lycoming sought to do so and sought to modify the existing approved type design, they'd have to go through the major or minor change mechanism. Don't you like to show that that change would not have been able to be approved by the FAA? No. I don't think that that is the relevant standard, and that is simply because we don't think that the Wyeth versus Levine framework is applicable here. We think that the relevant question is whether Kelly, who is, again, really the relevant actor because of the sort of the oddity of this case, we think the question is whether Kelly could have independently implemented the proposed design change without FAA approval, without any need to engage in this predictive judgment. Where is that standard? That is the standard from the Bartlett decision. But Bartlett, those cases had to do with the sameness of generic manufacturers. There was no way a change could have been made because they had to mirror the brand name. Yes, without some FAA action. Well, but the FAA action would have been. Or FDA action. Yeah, the FDA action would have been. There had to be a negotiation, and you recommend changes, et cetera, et cetera. But if they came and said, listen, we want to change this warning because it's not appropriate, and this is what the warning should have been under state law, it's an impossibility because it had to be exactly the same as the brand name. Yeah, I don't disagree with any of that, Judge Rendell, but I think that to the extent that you look at how you reconcile what happened in Bartlett and what happened in Mensing with what happened in Wyeth v. Levine, and the Supreme Court in Mensing does this in footnote 8, the critical difference is the way in which the regulatory regime operates, as Judge Schwartz alluded to during my friend's argument. And critically, the regulations at issue in Wyeth v. Levine, the CBE regulations, expressly authorized changes to be made without FDA preapproval. Here, by contrast, if you look at the relevant regulations, even with respect to minor changes, and I will incorporate by reference Judge Brand's discussion about why it's very odd to look at minor changes here, given plaintiff's theory of the case. But even accepting that those are the relevant regulations, the regulations by their terms, unlike the CBE regulations, do not expressly authorize changes to be made without FAA preapproval. Quite to the contrary, they simply afford the FAA discretion to determine the acceptable method. And I would respectfully submit, and this is a question for Mr. Singh, what is the best authority, affirmative authority, for the proposition that minor changes can be made without preapproval? Let's go back to what Judge Rendell was asking about Wyeth and its clear test, which says you've got to show by clear evidence, in this case, the FAA would not have approved the change. I understand you don't want us to apply Wyeth. You'd like us to be in Bartlett land. If Wyeth is the test, the record here demonstrates, arguably, the existence of evidence of a change between the correspondence from the FAA saying, hey, Lycoming, you've got to address this problem, to correspondence from the FAA saying, you're the type certificate holder, you're responsible for the design and correcting service problems. Isn't this a record that would demonstrate that the no clear evidence test in Wyeth could not succeed? So just to be clear, Judge Schwartz, I think that the clear evidence standard is sort of an exception. In other words, it's an exception to the principle that there is no impossibility preemption where you can make the change yourself without preapproval. So I would sort of stand primarily on the ground that when you're dealing with minor changes, you know, the regulations themselves do not authorize minor changes to be made without preapproval. And again, if there's any doubt about that, this Court can once again ask for the views of the FAA. The FAA, at its earlier brief, in no way suggested that minor changes could be made without a preapproval. Can you give us, then, your proposed conflict preemption test? So our proposed test is a quite simple test. It is whether we could have implemented, or Kelly, in this case, could have implemented the proposed design change without FAA approval. And we, in our brief, cite the language from FLEVA versus Mensing to that effect. That, I would respectfully submit, is the Mensing test. But the only other thing I would say to sort of circle back to Judge Schwartz's last question is that I do think that this question about whether you're using the major or minor change framework is really a central question. And there's no accident that Judge Brand spent several pages on this issue in his opinion. He thought this was really critical. The reason why this is critical is because I think my friend, Mr. Singh, basically conceded that with major changes, you have to have FAA preapproval. And I think that was a prudent concession because this Court said as much in its earlier opinion. 822F3rd at 703. And as Judge Roth pointed out, a major change is defined as a change that has an appreciable effect on characteristics affecting the error-worthiness of the product. The last part is language that my friend left out when he was quoting the relevant regulation. And the reason that is important is because that is deliberately expansive language. That is language designed to force changes into major changes. It's very broad in defining what constitutes a major change. And as Judge Brand pointed out, the oddity of this case is that plaintiff's whole theory of the case is that the fastening mechanism at issue, a fastening mechanism that the FAA still permits to this day, somehow caused the accident. In other words, that it, in any colloquial, common-sense understanding of the term, affected the error-worthiness of the product. And so plaintiff's theory of the case at state law runs directly into what I think is a conceded preemption problem because even under plaintiff's formulation of the preemption standard, the talismanic consideration in that standard is whether preapproval is required. And it certainly is for major changes whether the relevant actor is, like Homing, the original designer of the product, or Kelly, the holder of the design approval for the replacement components. But your test for preemption would require us to find conflict when we really don't know that there is any conflict. Isn't that correct? Because you could go to the FAA and get approval for the state, what you say is what should have happened under state law, and the FAA could approve it, and there would be no conflict. But you say, aha, it's conflict preempted because the FAA has to approve it? Yes, which is to say that I think that the ordinary test turns on whether intervening government action is required. And the reason why Wyeth v. Levine is different is because the regulations at issue immediately permit you to make the change. So your position is a type certificate immunizes, right? Our position is that where the FAA has passed on the relevant design feature, then yes, in other words, there is no liability for the simple reason that government approval is required to make a change. And there is no dispute in this case that the FAA passed on this particular issue. Indeed, what is artificial about or unusual about this case is the fact that the FAA, on my Cummings request, approved a change with regard to similarly designed carburetors to the lock-tab washer design prior to the type certification of this particular engine. Plaintiff concedes at page 969 that the type design here included lock-tab washers. And again, to this day, the FAA has not mandated a change to safety wire in this or other similarly situated engines. But in August of 65, Lycoming issued an engineering change order that implemented the lock-tab washers to secure the hex screws, right? And then afterwards, they applied for and got a type certificate that authorized that. They made the change. They did not. Plaintiff suggests that it was done unilaterally, and I would respectfully submit that that is not correct. It did internally use an engineering change order to change its production, but it did so after it sought approval from the FAA requesting approval for the change to lock washers. And that's a joint appendix, page 1681. In other words, I think that the history of this particular fastening mechanism confirms the view that as a matter of internal practice, Lycoming, in fact, sought preapproval from the FAA. But how about when the DER in February of 65, the DER approved the use of lock washers instead of safety wire? So, I mean, they were making changes all over the place and then got after the fact, had the FAA bless them. Lycoming submitted this change to FAA approval before it actually made the change, and I think that that's consistent with our view. We certainly take the view, Judge Randell, it will not surprise you to hear, that we think that this would qualify as a minor change because, of course, our position is that both of these fastening mechanisms are fine for purposes of airworthiness. In other words, our position is consistent. Can I just hear both of you say this is a minor change? Well, I think our view is that it's a minor change, but I think that for plaintiff's theory of the case to move forward, it has to be a major change. That's why I'm a little bit perplexed by the obvious tension in Mr. Singh's argument, between his argument as a matter of state law as to why we should be held liable and his argument on the preemption issue. And Judge Brand certainly thought that that was problematic. I don't think that he thought that that was in any way dispositive of the analysis, but I think that he thought that it was very problematic when you get to the preemption issue, that their theory, that this fastening mechanism caused the crash, has to be reconciled with this view that as a matter of federal law this did not involve, in the words of the regulation, something that has an appreciable effect on characteristics affecting the airworthiness of the product. Unless the Court has any further questions, I respectfully submit that the judgment be affirmed. Thank you. All right. Thank you. I want to address a couple of specific points before just talking about the big picture of the presentation you just heard. First, Mr. Shanmugam says that the Lycoming sought and received FAA approval to use these lock-tab washers. You'll find a discussion of this on page 25 of our reply brief, which cites the 28-J letter that we submitted in the previous appeal. This is an incredibly misleading statement, because the carburetors on which the FAA granted approval to use the lock washers were all ones that have six screws connecting the top half to the bottom half. It refused to grant the permission on any carburetors that only have four screws. So I think that actually to the extent that FAA action speaks to the FAA's thoughts about this, it speaks in the other direction. Another thing that Mr. Shanmugam mentions is that the manufacturer or seller can only really refer, for strict liability purposes, to the person that makes the individual part. I'd like you to look at three cases about this, all of which are cited in our briefs. The first one is Dantona v. Hampton Grinding Wheel. The second is Meriwido v. E.W. Bliss Company, a decision of this Court. And the third is Gonzalez v. Thomas Built Buses. In each of these cases, what happened is that parts from different manufacturers were incorporated together, and then the manufacturer of the larger product containing the component parts made by another manufacturer was nevertheless eligible to be held strictly liable. All of these cases stand for a black-letter proposition of Pennsylvania law, which is that when components are combined onto a larger product, they don't absolve the manufacturer of the larger product of liability unless the integration of those components is a substantial, unforeseeable change. That's a jury question, and they have no evidence on it. So even under black-letter Pennsylvania law, I agree, no need to certify anything there. Our primary theory of liability is they're liable for the engine, and they don't have any good answer to that. You notice he spent the entire presentation only discussing our second theory of liability, that they're directly liable for the carburetor. The last thing that I want to talk about is preemption, and this moves us into the big picture. It is clear now that their rule would preempt every design defect case, because they would say any time a change causes an air crash, it has an appreciable effect on airworthiness. Therefore, the change must be major. Therefore, you must have to go to the FAA, and the fact that you have to go to them means there's impossibility preemption. It's preemption of literally every claim relating to literally every dangerous design feature. What about their statement that it's a minor change? Where does that take you? I actually do think that you can say that this is a minor change, even though we are arguing that it's relevant to safety, because the question of whether state law would regard the product as defective is not dispositive of the separate factual question of whether the FAA would allow a manufacturer to do this as a minor change. There is a body of facts out there that Lycoming has not introduced into the record, despite our request that somebody do so. And the district court didn't reopen the record for it after the remand from this court. There's a body of law, of facts, about how often the FAA approves minor changes, of what types of changes come through as approved. And although there's been a lot of focus in today's appeal by them on this idea that if it has any effect on safety, it must be a major change, this is the first time they've made that argument. And we've jumped up and down about this position that it could be a minor change for a while, and their response steadfastly until now has been it doesn't matter, because even minor changes need preapproval. The last thing I'd like to talk about is that point. It's not true. So if you look at the documents that we cite in our brief, there's a document in footnote six of our opening brief, which describes a proposed best practices procedure for approving minor changes. That proposed best practice procedure is for the company in-house, purely in-house, to evaluate that the change is minor, to get all the data that says it meets their readiness requirements, and then to put that data on a shelf in case the FAA audits them. The document says some manufacturers do that, and it would be acceptable to the FAA. What the manufacturers have to do is they have to come up with a method that is acceptable to the FAA. That means they have to negotiate with the FAA about how they're going to do all their minor changes. Large manufacturers like Lycoming get tremendous latitude in how they do this, and they could easily negotiate a procedure, and they may, in fact, have already done so. They just haven't told us what their procedure actually is, but they may have already done this, where they have a procedure where they don't have to go to the FAA. So it's your position that if it's a minor change, they don't have to go to the FAA, therefore there is no conflict. If it's a major change, WISE requires them to show the FAA would not make the change. Is that your argument? That's correct. Now, what I gestured at in the opening argument was that it is also possible that for some manufacturers, the delegations that have been afforded to them are so broad that they can maybe even make major changes only using a designated engineering representative. But that is, in essence, by statute considered approval by the FAA. Kind of. They are exercising the delegated power of the FAA. But for purposes of impossibility preemption, imagine- But Congress says that the power shall be delegated. That's correct. It's delegated. That is absolutely correct. But compare this to PLEVA versus Mensing. So in PLEVA, the actual holding of the case said that when you need to seek the special permission of a federal agency, and the federal agency must take special action to allow you to do what state law requires, that's enough to trigger preemption. If you only have to consult somebody who's on your payroll, regardless of- Well, but an EER is not just somebody on your payroll. Well, that's true. But let me give you a hypothetical that might make my point. Let us assume, for example, there was a statute that said a company can do something. But before it does so, it has to get an opinion from its in-house counsel certifying that to the best of her legal ability, the change would not violate any applicable law. If there was a statute that required you to seek such an in-house counsel certification internally, I don't think anyone would say that that gives rise to impossibility preemption, even though the lawyer is required to exercise independent judgment. But that's not an EER either. I agree. But the EER is essentially the engineering equivalent of your in-house counsel. Well, but the EER is a position created by statute to give an independent evaluation, not the manufacturer's evaluation. Oh, that's absolutely correct. And if Congress wanted to set it up that way, it is not for us to say, well, obviously we're going to disregard what the EERs ever say because- No, I'm not saying that all we should disregard what they would say. I think the key point is actually, here is the question that you put to the EER. If you want to do a design change and you have to go through the EER, you submit the data to the EER, and you say, does this data show the design meets the applicable error-awareness requirements? And our argument emphatically is not that DERs fudge the analysis or do anything other than faithfully apply the law here. They do everything they're supposed to do. Assume that. In this case especially, it is effectively conceded, just now by Mr. Schoenmugam, that both of the designs in question, the design we say is safe and the design that Lycoming has comply with the federal error-awareness requirements. So it is conceded that if you- All right, but that's their theory of the case, which is different from your theory of the case. And they're saying, under your theory of the case, it's a very different situation. They're saying that we don't even know what caused this crash in the first place. That's correct. But, Your Honor, the one thing we both agree on is that our design complies with error-awareness requirements. That is the design using safety wire. And so if you were to ask a DER, acting fully in good faith, exactly as the statute contemplates that they do. So if you were to ask that Lycoming employee, is this change okay? They would say yes, concededly, in this case. Right? And so here is the situation we have. The situation we have is that in order to implement a change, maybe- I don't even know if they need a DER signature because if it's a minor change, they may not even need that. But assuming they need a DER signature, right? The situation is a manufacturer has to consult one of its own employees. It doesn't have to call the FAA or send them a letter or anything. It just has to ask its own employee- It has to consult a DER, which may be paid by them, but is not its own employee. No, they are the employee of the manufacturer. Yeah, but they have a statutory duty. Yes, yes, of course. The point is that they have to comply with it. Of course. It's a regulated employee. Right? Many employees are subject to certain regulations. You know, you're not a jury. Yeah. Absolutely, but I'm just saying that I think that it is- The question for impossibility preemption, at least as far as it goes, to the extent you think the impossibility inquiry turns on whether the manufacturer can take unilateral action, I hope it would be intuitive that there is a world of difference between this situation, where they're only consulting the DER, and the situation in the generic drug cases, where the generic drug manufacturer has to consult the FDA, ask the FDA to consult with the name brand manufacturer, take regulatory action to then alter the label, and then by operation of law, the generic drug manufacturer would be bound. That was the sort of action that gave rise to impossibility preemption in PLEVA and in Bartlett. And I think that there is just a world of difference between this and that. And I don't mean to oversell the point. I'm not trying to say the DERs are the property of the manufacturer or can be directed by the manufacturer to do anything that's contrary to law. That's not the premise of our argument. The premise of our argument is simply that this is a lot easier than anything that was looked at in the generic drug cases. In fact, I think it's easier than having to submit the application in YF. Okay. Thank you very much, counsel. Thank you to both sides for a well-argued and well-briefed case. We will take the matter under advisory.